McDIVITT (BANKS v.). See Case No. 961.

---

## Case No. 8,751.

### In re McDONALD.

[9 Am. Law Reg. 661.]

District Court, E. D. Missouri. 1861.

HABEAS CORPUS—JURISDICTION OF FEDERAL COURT —EXCLUSIVE JURISDICTION—HOW DETERMINED —HISTORY OF HABEAS CORPUS.

1. A United States district judge, or a United States district court, has jurisdiction to issue the writ of habeas corpus, and hear the case when the petitioner is held under illegal restraint, without any formal or technical commitment.

> [Cited in Re Reynolds, Case No. 11,722.]

2. The writ of habeas corpus may issue from a federal judge whenever the applicant is illegally restrained of his liberty, under or by color of the authority of the United States, and such case is exclusively within the jurisdiction of the federal tribunals.

> [Cited in Re Farrand, Case No. 4,678.]

3. The question of jurisdiction is to be determined by the acts of congress and the decisions of the supreme court, the circuit courts, and the district courts of the United States, thereupon.

4. The construction and interpretation of the acts of congress, of September 24, 1789, § 14 [1 Stat. 81], and of March 2, 1833, § 7 [4 Stat. 634].

5. The history of the habeas corpus, under the judiciary acts and the force bill, as drawn from the adjudicated cases, given and explained.

6. The adjudicated cases on the habeas corpus in the supreme court, in the circuit courts, and in the district courts of the United States, cited, and commented on.

[In the matter of Emmet McDonald.]

TREAT, District Judge. Since the adjournment, as thorough an examination of authorities as practicable has been made, with the view of arriving at a correct conclusion upon the jurisdictional question presented. Every authority cited by the learned counsel, and their able arguments, have been carefully considered. The question, though one of pure law, involves an inquiry into the United States constitution and statutes, the organization of the United States courts, the power vested in United States judges, and the sources of American jurisprudence. In the hasty preparation of an opinion taking so wide a range, it is not to be expected that much labor has been bestowed upon logical order or method, or mere forms of expression. The important consideration is to reach a correct conclusion. The undivided attention of the court, therefore, has been fixed upon the single proposition submitted. With other points

or issues, which may or may not be reached in the further prosecution of this cause, the court, at this time, has nothing to do.

The case stands, at present, on a demurrer to the return. The counsel for the respondent has suggested a question of jurisdiction; and, as that question always lies in limine, it is right and proper that it should be first considered. As a preliminary step, then, it must be determined whether the court has jurisdiction—whether it can proceed any further in the matter before it; for, most certainly, when asked to pass upon the authority of others, official or otherwise, it should be scrupulously careful not to exceed its own legal powers. The duty to decide what the law is, in each case before it, and to enforce its decisions for the maintenance of constitutional and legal authority in whomever vested, for the time being, is no less imperative than to protect the humblest rights of persons and property. Every officer of the government, and every private citizen, is alike entitled to the full measure of protection furnished by law, and is alike responsible to it for every violation of its mandates. In its administration, there is no inequality—all stand before it on the same level. Has a United States district judge, or a United States district court, jurisdiction to issue the writ of habeas corpus and hear the case, when the petitioner is held under illegal restraint without any formal or technical "commitment?" Is it not essential to such jurisdiction that the petitioner should be in jail, or imprisoned by virtue of some judgment, warrant, order, rule, or process, judicial or otherwise—or, at least, be so held "under restraint?" Or, on the other hand, is it sufficient that he is illegally restrained of his liberty "under or by color of the authority of the United States," irrespective of the fact whether there has been a technical "commitment" or not? In short, is this case one of federal or exclusively state jurisdiction?

The petition, on which the writ was issued, avers substantially, that the petitioner is now, and has been since the 10th inst., held in unlawful confinement within the United States arsenal in this city, a military post under the command of the respondent; that he is so held under no writ, process, judgment, decree, committal, or order of any state court, or state officer, or by virtue of any state law, proceeding, or power, civil or military; that, "on the contrary, his said illegal confinement is under or by color of the authority of the United States;" and that said unlawful confinement is by no order, judgment, decree, or committal of any judicial tribunal of the United States, nor in virtue of any writ or process issuing therefrom. The petition then sets out the facts and circumstances connected with his caption, which are unimportant at this stage of the case, inasmuch as they do not qualify, in any manner, the direct averments above mentioned. Hence the jurisdictional question is free from all technicalities pertaining to careless use of language, for the averments are full and precise. It becomes a fundamental question, then, in the case, and must be directly and fairly met at the very threshold. Nothing has, in many cases, been more perplexing to American jurists than a correct definition of the exact limits, or the ascertainment of the true boundaries, between federal and state jurisdiction. In some classes of cases, federal jurisdiction is exclusive; in some, state jurisdiction; whilst in others the federal and state judiciary have concurrent authority. The dividing line is not always to be readily ascertained.

The whole power vested by the United States constitution in the federal judiciary has never yet been called into potential or full force and activity; nor have the necessary statutes been passed to give vital and practical energy to all of the grants of power concerning any of the three great departments of the government. The courts are, therefore, compelled to pass upon each case separately, as it arises, limiting their decisions to the particular facts before them. In the organization of the United States district courts, congress has defined the portion of judicial power with which they are entrusted. Turner v. Bank of North America, 4 Dall. [4 U. S.] 8. Beyond that limit they cannot pass. 1 Kent. Comm. 294. It is not whether congress could not have vested in them larger powers; but simply what authority has actually been entrusted to them. Hence, in each instance, recurrence must be had to the United States statutes; and, if those statutes are within the grants of the constitution, the means are at hand for settling the controversy. No actual or apprehended conflict between the state and federal authority exists in this case; yet the inquiry is just as appropriate concerning the extent of power really vested in this tribunal. Every public officer —whether executive, ministerial, or legislative—has to decide for himself, in the first instance, the true extent of his authority, subject always, in free governments, to a lawful revision of his acts in every case which may involve their validity. So is it, most unquestionably, with judicial officers and courts. Hence acts of congress have been solemnly pronounced unconstitutional and void; executive mandates condemned as in contravention, or without authority of law; ministerial proceedings, supposed legal for a time, finally adjudged trespasses; and judicial decisions overruled and annulled by superior judicial tribunals. Yet there is no instability in all this; it is merely an assertion of the fundamental principle of free government, viz. the supremacy of law. A thorough knowledge of the law, applicable to each case, and implicitly followed, would render all conflict of legal authority almost an impossibility. It is only necessary, therefore, to avoid conflicts, for citizens, whether acting in their private or official capacity, to understand correctly their legal rights and duties—to comprehend fully that, in all the varied and shifting exigencies

of public and private affairs, law is still supreme—the source of all legitimate authority, the only power no one can disobey with impunity, to which all are subject, and which all have an equal right to invoke for the maintenance of their lives, liberties, and property. No one in this land is so exalted as to be above its restraining force, and none so humble as to be beneath its protecting care. Were it otherwise, lawlessness would dominate, anarchy follow, and liberty itself be impossible, for "there can be no liberty save in the harness of the law." "When the law ceases to be the test of right and remedy—when individuals undertake to be its administrators by rules of their own adoption—the bonds of society are broken. The first duty of citizens in a government of laws is obedience to its ordinances." Johnson v. Tompkins [Case No. 5,416]. Foremost of all should be the tribunals of law, to keep strictly within legal limits. Whilst fearless in the exercise of lawful power, they should be scrupulously vigilant not to exceed the legal boundaries set to their action. They minister at a sacred altar, and with religious fidelity must they be true to their trust. They can yield nothing, and must assume nothing. Like the supreme court of the United States, they "must grasp at nothing—shrink from nothing." In this spirit the courts should always act, and in modern times have generally acted. Hence it is that jurisdictional questions occupy so large a portion of judicial inquiry; and well is it that such has been the fact, for the conclusions thus reached enable others to recur to the past for its calm solution of propositions, which excitements of a subsequent hour might distort or color with passion or prejudice.

The language of Judge Cranch (U. S. v. Bollman [Case No. 14,622]), is especially instructive, because, in the very case in which he gave utterance to such correct thoughts, he was overruled by his colleagues, but sustained, on review, by the United States supreme court: "In times like these, when the public mind is agitated—when wars and rumors of wars, plots, conspiracies and treasons excite alarm—it is the duty of a court to be peculiarly watchful, lest the public feeling should reach the seat of justice, and thereby precedents be established which may become the ready tools of faction in times more disastrous. The worst of precedents may be established from the best of motives. We ought to be upon our guard, lest our zeal for the public interest lead us to overstep the bounds of the law and the constitution; for, although we may thereby bring one criminal to punishment, we may furnish the means by which a hundred innocent persons may suffer. The constitution was made for times of commotion. In the calm of peace and prosperity, there is seldom great injustice. Dangerous precedents occur in dangerous times. It then becomes the duty of the judiciary calmly to poise the scales of justice, unmoved by the arm of power, undisturbed by the clamor of the multitude. Whenever an application is made to us in our judicial character, we are bound, not only by the nature of our office, but by our solemn oaths, to administer justice according to the laws and constitution of the United States. No political motives, no reasons of state, can justify a disregard of that solemn injunction. In cases of emergency, it is for the executive department of the government to act upon its own responsibility, and to rely upon the necessity of the case for its justification; but this court is bound by the law and the constitution in all events. When, therefore, the constitution declares that 'the right of the people to be secure in their persons' 'against unreasonable seizures,' 'shall not be violated,' and that 'no warrants shall issue but upon probable cause, supported by oath or affirmation,' this court is as much bound as any individual magistrate to obey its command."

These truths, though elementary, are too apt to be overlooked. No apology is necessary for recurring to them at this time.

First. As to the right and duty of every court to decide upon the extent of its own jurisdiction, and the duty of every party upon whom process is served to appear in obedience thereto: "Every day and in every court, writs issue at the instance of parties asserting a grievance, and very often when, in truth, no grievance has been sustained. The party assailed comes before the court in obedience to its process. He perhaps questions the jurisdiction of the court. Perhaps he denies the fact charged. Perhaps he explains that the fact, as charged, was by reason of circumstances a lawful one. The judge is not presumed to know beforehand, all the merits of the thousand and one causes that come before him; he decides when he has heard. But the first duty of a defendant, in all cases, is obedience to the writ which calls him into court. Till he has rendered this, the judge cannot hear the cause, still less pass upon its merits." U. S. v. Williamson [Case No. 16,726]. Opinion of Judge Kane. "There are some proceedings in which the want of jurisdiction would be seen at the first blush, but there are others in which the court must inquire into all the facts, before it can possibly know whether it has jurisdiction or not. Any one who obstructs or baffles a judicial investigation for that purpose, is unquestionably guilty of a crime, for which he may and ought to be tried, convicted and punished. Suppose a local action to be brought in the wrong county, this is a defence to the action, but a defence which must be made out like any other. While it is pending, neither a party, nor an officer, nor any other person, can safely insult the court, or resist its order. The court may not have power to decide upon the merits of the case, but it has undoubted power to try whether the wrong was done within its jurisdiction or not. Suppose Mr. Williamson to be called before the

circuit court of the United States, as a witness, in a trial for murder alleged to be committed on the high seas, can he refuse to be sworn, and at his trial for contempt justify himself on the ground that the murder was in fact committed within the limits of a state, and therefore triable only in a state court? If he can, he can justify perjury for the same reason. But such a defence for either crime has never been heard of, since the beginning of the world. * * * The duty of the court to inquire into the facts on which its jurisdiction depends, is as plain as its duty not to exceed it when it is ascertained." 26 Pa. St. 21.

Second. As this court must determine its own jurisdiction, the next inquiry is as to the mode of ascertaining it. Here it is better that the views of this court should be expressed in the language of Chief Justice Marshall, speaking the authoritative conclusions of the United States supreme court; authority which a United States district court, if so disposed, cannot properly disregard. The doctrine, as asserted by him, no American court or jurist can justly question. It is a correct and clear exposition of the law: "Courts, which originate in the common law, possess a jurisdiction which must be regulated by the common law, until some statute shall change their established principles; but courts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction. It is unnecessary to state the reasoning on which this opinion is founded, because it has been repeatedly given by this court, and with the decisions heretofore rendered on this point, no member of the bench has ever for an instant been dissatisfied. The reasoning from the bar in relation to it, may be answered by the single observation that for the meaning of the term 'habeas corpus' resort may unquestionably be had to the common law, but the power to award the writ by any of the courts of the United States must be given by written law. This opinion is not to be considered as abridging the power of courts over their own officers, or to protect themselves and their members from being disturbed in the exercise of their functions; it extends only to the power of taking cognizance of any question between individuals, or between the government and individuals. To enable the court to decide on such question, the power to determine it must be given by written law." Ex parte Bollman, 4 Cranch [8 U. S.] 93.

Third. That written law is found in the act of 24th September, 1789, § 14 (1 Stat. 81), commonly known as the "Judiciary Act," and in the act of 2d March, 1833, § 7 (4 Stat. 634), usually denominated the "Force Bill." The history of each of those statutes is familiar to all, and suggestive of profound thought. The section in the act of 1833, conferring upon United States judges increased power to proceed by habeas corpus, was not by the terms of that act made temporary, whilst many of its other provisions were expressly limited in their operation to the end of the next session of congress then ensuing. The grave questions which have arisen within the last ten years, as to the scope of the powers granted to the United States judges by that act, will be alluded to in another part of this opinion. It is sufficient now, to consider, first, the act of 1789. Before analyzing this act and ascertaining its true construction, it may be well to remark that the case of U. S. v. French [Case No. 15,165], cited by counsel, decides nothing more than was afterwards directly held by the United States supreme court in Ex parte Dorr, 3 How. [44 U. S.] 103, viz.: That when a "commitment" is known to be under state authority, the United States courts and judges have no power to issue the writ of habeas corpus, and hear the cause. In the case of Wilson v. Izard [Case No. 17,810], the United States court took jurisdiction where the petitioner was restrained by authority of his enlistment in the United States service; and similar cases occur each year. In none of those cases is there, it is apprehended, any technical commitment; yet in the many acts of congress upon the subject of enlistment, there may be, in addition to the act of 3d March, 1799 [1 Stat. 749], similar provisions of a special character, conferring jurisdiction upon United States district and state judges, to hear applications for this writ in such matters, or in cases arising under such statutes. As time has not permitted an examination of all those acts, to ascertain what are still in force with reference to the discharge of soldiers from enlistment in the regular army, and as the judiciary act seems perfectly clear, it is not necessary, for the case before the court, to pursue that collateral inquiry. If there be no such special statutes, and Wilson v. Izard [supra], was decided by the United States circuit court for New York, by virtue of the authority granted in the act of 1789, then that case is directly in point. The act of 1789 seems sufficiently explicit, of itself. When the history of this writ, and the views of those who framed the United States constitution and the act of 1789, are considered, there is scarcely room for doubt. The legal controversy leading to the American Revolution, and the persistent demand of the colonists that they were entitled to the privileges of Englishmen, among which they claimed that of the habeas corpus as inestimable in value—"the inheritance of the free born subject"—would induce the belief, that among the first acts passed by those patriotic statesmen would be one securing those privileges to as full an extent, at least, as they had insisted upon them whilst subjects of England. And so they did. In the constitution they inserted a direct prohibition against the suspension of the privilege of the writ of habeas corpus, "unless when in cases of rebellion or invasion the public safety may require it"—being careful to use the very words they had employed during their ante-revolutionary struggle

with England—the privilege of the writ, and not merely the writ itself. They struck deeper than the form, and insisted upon the substance—the underlying principle—the privileges for the vindication of which that writ had been immemorially used. The history of the American colonies, as well as of England, furnishes the amplest commentaries upon the part that writ has performed in every struggle for freedom. The act of 1789 has received the deserved encomiums of all eminent American jurists for its perspicuity and comprehensiveness—second only in those respects to the precise language of the constitution itself. It would be, indeed strange, if in the organization of judicial tribunals, the members of the first congress had overlooked the importance of that writ, or had virtually suspended it, or fatally impaired the privileges it secures in the many and essential cases where arbitrary authority might act without warrant, or "due process of law." And still stranger would it appear when it is remembered, that at its first session that very congress proposed for adoption the first ten amendments to the constitution, the fifth of which declares that "no person * * * shall be deprived of life, liberty, or property, without due process of law"—words which Justice Curtis, delivering the opinion of the United States supreme court in Murray's Lessee v. Hoboken Co., 18 How. [59 U. S.] 276, said "were undoubtedly intended to convey the same meaning as the words 'by the law of the land' in Magna Charta." Still, if the act of 1789, by omission or otherwise, is as narrow in its limitations as contended for, no degree of surprise thereat can supply its omissions or change its terms. It must be taken as it is written, and fairly construed. The 14th section is as follows: "And be it further enacted, That all the before-mentioned courts of the United States shall have power to issue writs of scire facias, habeas corpus, and all other writs not specially provided for by statute, which may be necessary for the exercise of their respective jurisdictions, and agreeable to the principles and usages of law. And that either of the justices of the supreme court, as well as judges of the district courts, shall have power to grant writs of habeas corpus, for the purpose of an inquiry into the cause of commitment. Provided, that writs of habeas corpus shall in no case extend to prisoners in gaol, unless where they are in custody under or by color of the authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify." 1 Stat. 81.

If there had never been a judicial exposition of that act, the student of legal history could hardly mistake its force and effect. The first sentence gives to the courts all the power they possess; and the second vests in the United States judges all the authority they have over the writ. It is well known how earnestly it was once contended that the United States courts, or at least the United States supreme court, had no authority to issue the writ, "except when necessary for the exercise of its jurisdiction" in some case actually pending before it. And as the supreme court, by the terms of the constitution, has no original jurisdiction except in "cases affecting ambassadors, other public ministers and consuls, and those in which a state shall be a party;" and as the writ of liberty—the habeas corpus ad subjiciendum—can scarcely be applicable to the exercise of its jurisdiction in any case already before it, on appeal; and as it has no appellate power given in criminal cases, it would have followed inevitably from that narrow construction, that it could deliver from unlawful restraint foreign ambassadors, ministers and consuls, but no American citizen. And still worse, upon that construction, the United States circuit or district courts could never use the writ for the great remedial purposes for which it had always existed—no federal court would have the needed power. Having thus construed away the power of the United States courts as to the most beneficial purposes of the writ, the judges of those courts would be left at chambers with an authority which the courts could never exercise, but an authority more limited than any British judge ever had at common law from the days of King John—even under the worst of the Tudors or Stuarts. But the language of the first sentence is not so narrow. The restriction has no application to the writs of habeas corpus and scire facias, but merely to "the other writs" referred to. The power granted to the United States courts by that act is as broad as if it read: they "shall have power to issue the writs of scire facias and habeas corpus agreeable to the principles and usages of law"—principles and usages as well understood as the meaning of the words "due process of law" in the fifth amendment to the constitution. And so on the Trial of Burr [Case No. 14,693], Chief Justice Marshall held: "The principles and usages of law mean those general principles and usages which are to be found, not in the legislative acts of any particular state, but in that generally recognized and long established law which forms the substratum of all the laws of every state."

But is there no limit to the powers of the United States courts? May they override all state process, judgments and decrees, and virtually discharge prisoners in custody for violation of state laws? If there were no provision on the subject in the act of 1789, still the reasonable construction would necessarily be, that the United States courts can take no jurisdiction beyond the range of federal authority—that they must confine their action within the purview of federal jurisdiction, and not interfere with cases belonging exclusively to the states. But the proviso to the second section has always been

held, and with manifest correctness, to limit the courts as well as the judges at chambers. That proviso was for the express purpose of preventing conflicts between federal and state authority — of confining the United States courts and judges within their appropriate spheres. On any other construction, we should have the strange anomaly of a statute conferring upon an individual judge at chambers, a power which congress was unwilling to entrust even to the supreme court of the United States, or to a circuit court. A district court, held by the district judge alone, in open term, could not do what the same judge by stepping down from the bench, could quietly do at chambers, and that, too, in a matter involving the liberties of the American people, within the purview of the United States authority. Any fair construction of the act of 1789, whilst extending the proviso of the second sentence to the whole section, and forbidding federal courts as well as judges from interfering with the legitimate authority of state tribunals, gives to both courts and judges power to inquire into every "cause or commitment under or by color of the authority of the United States;" not narrowing them down to cases of technical or formal arrests by judicial process and leaving them powerless when arbitrary will, assuming to act in the name of the United States, chooses to trample upon every constitutional guaranty for the protection of individual liberty. If process issued from a judicial officer of the United States government, the citizen would have at least the assurance that such officer could not, without the grossest and most palpable violation of his sworn duty, proceed except by "due process of law," yet if he is left remediless where his liberties are trodden down without any legal process whatsoever, he would be delivered over to the tender mercies of every federal officer who chooses to outrage his constitutional rights—his "inheritance as a free-born subject."

Reference was made by counsel to contemporaneous history for aid in construing this act. Such reference is always legitimate where there is any obscurity in the terms employed; and so is the other rule, also invoked, that the use of a technical term in a statute is supposed to carry with it its technical meaning and application. If the act of 1789 is tested by these rules the same result, already indicated, is just as clearly reached. The ante-revolutionary controversies of a legal character, together with the debates in the British parliament upon those questions, furnish ample light to illuminate our pathway. It is not to be supposed that the American statesmen of the Revolution, who drafted the constitution and the act of 1789, were ignorant of the controversy which had just taken place in the British parliament with respect to this writ and its privileges; particularly as they had petitioned and remonstrated from time to time upon the same subject. The following compendious history of that parliamentary struggle, if resort is had to contemporaneous events, will most probably furnish the best guide to what was in the minds of the first congress when the judiciary act was passed: "In the year 1757, the above act of the 31 Car. II. c. 2 (habeas corpus act) came under discussion, in both houses of parliament upon the following occasion. A gentleman having been impressed before the commissioners under a pressing act passed in the preceding session, and confined in the Savoy, his friends made application for a writ of habeas corpus, which produced some hesitation and difficulty, for according to the above statute, the privilege relates only to persons committed for criminal, or supposed criminal matters, and this gentleman did not stand in that predicament. Before the question could be determined, he was discharged, in consequence of an application to the secretary of war. But the nature of the case seeming to point out a defect in the act, a bill for giving a more speedy remedy to the subject upon the writ of habeas corpus was prepared, and presented to the house of commons. It imported that the several provisions made in the above act (31 Car. II.) for the awarding of writs of habeas corpus in cases of commitment, or detainer for any criminal or supposed criminal matter, should in like manner extend to all cases, where any person, not being committed or detained for any criminal or supposed criminal matter should be confined, or restrained of his or their liberty under any color or pretence whatsoever, that upon oath made by such person so confined, or restrained, or by any other person on his behalf, of any actual confinement or restraint, to the best of the knowledge and belief of the person so applying, was not by virtue of any commitment, or detainer for any criminal or supposed criminal matter, an habeas corpus, directed to the person or persons so confining or restraining the party, should be granted in the same manner as is directed, and under the same penalties as are provided by the said act in the case of persons committed or detained for any criminal or supposed criminal matter, that the person before whom the party should be brought, by virtue of an habeas corpus, granted in the vacation time, under the authority of this act, might and should, within three days after the return made, proceed to examine into the facts contained in such return, and into the cause of such confinement and restraint, and thereupon either discharge, or bail, or remand the party so brought, as the case should require, and as to justice should appertain. The rest of the bill related to the return of the writ in three days, and the penalties upon those who should neglect or refuse to make the return, or to comply with any other claim of this regulation. See the bill and the arguments for and against it, in the appendix to 7, Debrett's Debates,

1743–1774. The bill was soon passed by the commons, but in the house of lords it was thrown out at the second reading, and the judges were ordered to prepare a bill to extend the power of granting writs of habeas corpus ad subjiciendum in vacation time, in cases not within the statute of 31 Car. II. c. 2, to all the judges of his majesty's courts at Westminster, and to provide for the issuing of process in vacation time to compel obedience to such writs, and that in preparing such bill, they take into consideration whether in any and in what cases it may be proper to make provision that the truth of the facts contained in the return to a writ of habeas corpus may be controverted by affidavits of traverse, and so far as it shall appear to be proper, that clauses be inserted for that purpose, and that they lay such bill before the house, in the beginning of the next session of parliament." 3 Bac. Abr. Append. to Habeas Corpus.

It should be carefully observed that what thus occurred was almost coeval with the American struggle for independence. The bill which passed the house of commons was at first delayed in the house of lords until the opinions of all the judges at Westminster hall could be had in answer to the celebrated interrogatories propounded to them. Those answers were subsequently made. Upon the strength of the judicial opinions thus given, Lord Mansfield caused the defeat of the bill in the house of lords, upon the ground that everything proposed in the bill was already the law just as indisputably and clearly as if that bill had ripened into an act upon the statute books of the realm. It was thus settled, in the opinion of the British judges and of the house of lords, just prior to the American Revolution, that "the privileges of the writ of habeas corpus agreeably to the principles and usages of law" "extended to all cases where persons not being committed or detained, &c., should be confined or restrained of his or their liberties under any color or pretence whatever." But American courts are no longer left merely to such modes of interpretation. The opinion of the United States supreme court was given upon the fourteenth section of the act of 1789 as early as 1807 by Chief Justice Marshall. Although the main point before that court had reference to its own character as an appellate court, except in the few cases already named; yet from that day to the present, the general views then expressed seem to have been recognized by all courts and judges as putting at rest every dispute about the extent of the power of the United States courts and judges, in cases of original jurisdiction, to issue the writ and inquire into the causes of illegal restraint where said restraint is "under or by color of the authority of the United States." To understand distinctly the views expressed by Chief Justice Marshall, it is necessary to keep constantly before the mind, the fact that the

supreme court was considering in what cases that tribunal, as an appellate tribunal, and not a court of original jurisdiction, could issue the writ. As the constitution defined and limited its powers in original cases, manifestly no act of congress could enlarge them; yet the act of 1789 was, in terms, broad enough to give to that court the same powers over this writ as to the circuit or district courts, which possessed a more enlarged original jurisdiction. So anxious were the framers of the act of 1789 not to restrict the privileges of this writ, that they had seemingly given to an appellate court original jurisdiction. Hence the supreme court, defining its own powers under the restrictions of the constitution and not under the act of 1789, limits itself to cases pending in or decided by those courts over which it has appellate or revisory power. It claimed a right to revise—a revisionary jurisdiction—over tribunals inferior to itself, or from whose decisions an appeal might ultimately be to the supreme court. In other cases of commitment—that is where the petitioner was imprisoned by other than United States district or circuit courts, it could not have jurisdiction because it had no appellate or revisory power. It followed logically that it could not issue the writ where there was no commitment by any court; for there would then be no action of a court over which it had appellate jurisdiction, which could come before it for revision. Hence its decisions in the cases of Dorr, 3 How. [44 U. S.] 103, of Barry, in 2 How. [43 U. S.] 65, of Barry v. Mercien, 5 How. [46 U. S.] 103, and Ex parte Metzger, in Id. 176, and In re Kaine, 14 How. [55 U. S.] 103. But in [Ex parte Bollman] 4 Cranch [8 U. S.] 93, and [Ex parte Watkins] 3 Pet. [28 U. S.] 201, that court states with sufficient distinctness its views of the case in which United States courts of original jurisdiction, and United States judges, have power to act, and also the scope of authority they possess. As the opinion of Chief Justice Marshall in 4 Cranch [8 U. S.] 93, is full and demonstrative, the principal portion of it is quoted; with a repetition of the remark that the distinction between courts of appellate and original jurisdiction must be borne constantly in mind whilst considering it:

The only doubt of which this section (14th section of judiciary act) can be susceptible, is whether the restrictive words of the first sentence limit the power to the award of such writs of habeas corpus, as are necessary to enable the courts of the United States to exercise their respective jurisdictions, in some causes, which they are capable of finally deciding. It has been urged that, in strict grammatical construction, these words refer to the last antecedent, which is "all other writs not specially provided for by statute." The criticism may be correct, and is not entirely without its influence; but the sound construction which the court thinks it

safer to adopt, is, that the true sense of the words is to be determined by the nature of the provision, and by the context. It may be worthy of remark, that this act was passed by the first congress of the United States, sitting under a constitution which had declared "that the privilege of the writ of habeas corpus should not be suspended, unless when, in case of rebellion or invasion, the public safety might require it." Acting under the immediate influence of this injunction they must have felt, with peculiar force, the obligation of providing efficient means by which this great constitutional privilege should receive life and activity; for, if the means be not in existence, the privilege itself would be lost, although no law for its suspension should be enacted. Under the impression of this obligation, they give to all the courts the power of awarding writs of habeas corpus. It has been truly said that this is a generic term, and includes every species of that writ. To this it may be added, that when used singly—when we say the writ of habeas corpus without addition, we most generally mean that great writ which is now applied for; and in that sense it is used in the constitution. The section proceeds to say, that, "either of the justices of the supreme court, as well as judges of the district court, shall have power to grant writs of habeas corpus for the purpose of an inquiry into the cause of commitment." It has been argued that congress could never intend to give a power of this kind to the judges of this court, which is refused to all of them when assembled. There is certainly much force in this argument, and it receives additional strength from the consideration, that if the power be denied to this court, it is denied to every other court of the United States. The right to grant this important writ is given in this sentence to every judge of the circuit or district court, but can neither be exercised by the circuit nor district court. It would be strange if the judge sitting on the bench should be unable to hear a motion for this writ where it might be openly made and openly discussed, and might yet retire to his chamber, and, in private, receive and decide upon the motion. This is not consistent with the genius of our legislation, nor with the course of our judicial proceedings. It would be much more consonant with both that the power of the judge at his chambers should be suspended during his term, (hence, in this case, the adjournment from the judge at chambers to the court in term,) than that it should be exercised only in secret. Whatever motives might induce the legislature to withhold from the supreme court the power to award the great writ of habeas corpus, there could be none which would induce them to withhold it from every court in the United States, and as it is granted to all in the same sentence and by the same words, the sound construction would seem to be, that the first sentence vests this power in all the courts of the United States; but as those courts are not always in session, the second sentence vests it in every justice or judge of the United States. The doubt which has been raised on this subject may be further explained by examining the character of the various writs of habeas corpus, and selecting those to which this general grant of power must be restricted if taken in the limited sense of being merely used to enable the court to exercise its jurisdiction in causes which it is enabled to decide finally.  * * * "

After a masterly analysis of various forms of the writ, he proceeds:

Fourth and last, common writ, ad faciendum et recipiendum "which issues out of any of the courts of Westminister hall, when a person is sued in some inferior jurisdiction, and is desirous to remove the action into the superior court, commanding the inferior judges to produce the body of the defendant, together with the day and cause of his caption and detainer (whence the writ is frequently denominated a habeas corpus cum causa) to do and receive whatever the king's courts shall consider in that behalf. This writ is grantable of common right, without any motion in court, and it instantly supersedes all proceedings in the court below." Can a solemn grant of power to a court to award a writ be considered as applicable to a case in which that writ, if issuable at all, issues by law, without the leave of the court? It would not be difficult to demonstrate that the writ of habeas corpus cum causa cannot be the particular writ contemplated by the legislature in the section under consideration; but it will be sufficient to observe generally that the same act prescribes a different mode for bringing into the courts of the United States suits brought in a state court, against a person having a right to claim the jurisdiction of the courts of the United States. He may, on his first appearance, file his petition, and authenticate the fact, upon which the cause is, ipso facto, removed into the courts of the United States. The only power, then, which on this limited construction would be granted by the section under consideration, would be that of issuing writs of habeas corpus ad testificandum. The section itself proves that this was not the intention of the legislature. It concludes with the following proviso: "That writs of habeas corpus shall in no case extend to prisoners in gaol unless where they are in custody under or by color of authority of the United States, or are committed for trial before some court of the same, or are necessary to be brought into court to testify."

This proviso extends to the whole section. It limits the powers previously granted to the courts, because it specifies a case in which it is particularly applicable to the use of the power by courts—where the person is necessary to be brought into court to testify. That construction cannot be a fair one which

would make the legislature except from the operation of a proviso, limiting the express grant of a power, the whole power intended to be granted. From this review of the extent of the power of awarding writs of habeas ·corpus, if the section be construed in its restricted sense, from a comparison of the nature of the writ which the courts of the United States would, on that view of the subject, be enabled to issue, from a comparison of the power so granted with the other parts of the section, it is apparent that this limited sense of the term cannot be that which was contemplated by the legislature. But the 33d section throws much light upon this question; it contains these words: "And upon all arrests in criminal cases, bail shall be admitted, except where the punishment may be death, in which case it shall not be admitted but by the supreme or a circuit court, or by a justice of the supreme court, or a judge of a district court, who shall exercise their discretion therein regarding the nature and circumstances of the offence, and of the evidence, and of the usages of law." The appropriate process of bringing up a prisoner, not committed by the court itself, to be bailed, is by the writ now applied for. Of consequence, a court possessing the power to bail prisoners not committed by itself, may award a writ of habeas corpus for the exercise of that power. The clause under consideration obviously proceeds on the supposition that this power was previously given, and is explanatory of the 14th section. If by the sound construction of the act of congress the power to award writs of habeas corpus in order to examine into the cause of commitment, is given to this court, it remains to inquire whether this be a case in which the writ ought to be granted. The only objection is, that the commitment has been made by a court having power to commit and to bail. Against this objection, the argument from the bar has been so conclusive that nothing can be added to it. If, then, this were res integra, the court would decide in favor of this motion. But the question is considered as long since decided. The Case of Hamilton, is expressly in point in all its parts; and although the question of jurisdiction was not made at the bar, the case was several days under advisement, and this question could not have escaped the attention of the court. From that decision the court would not lightly depart. U. S. v. Hamilton, 3 Dall. {3 U. S.] 17. If the act of congress gives this court the power to award a writ of habeas corpus in the present case, it remains to inquire whether that act be compatible with the constitution. (Here the distinction is drawn between courts of appellate and of original jurisdiction.) In the mandamus case, Marbury v. Madison [1 Cranch (5 U. S.) 137], it was decided that this court would not exercise original jurisdiction except so far as that jurisdiction was given by the constitution. But so far as that case has been dis-

tinguished between original and appellate jurisdiction, that which the court is now asked to exercise, is clearly appellate. It is the revision of a decision of an inferior court, by which a citizen has been committed to gaol. It has been demonstrated at the bar that the question brought forward on a habeas corpus, is always distinct from that which is involved in the cause itself. The question whether the individual shall be imprisoned is always distinct from the question whether he shall be convicted or acquitted of the charge on which he is to be tried; and, therefore, these questions are separated, and may be decided in different courts. The decision that the individual shall be imprisoned, must always precede the application for a writ of habeas corpus, and this writ must always be for the purpose of revising that decision, and therefore appellate in its nature. But this point also is decided in Hamilton's Case, and in Burford's Case [supra]. If at any time the public safety should require the suspension of the powers vested by this act in the courts of the United States, it is for the legislature to say so. That question depends on political considerations, on which the legislature is to decide. Until the legislative will be expressed, this court can only see its duty, and obey the laws.

Hence the supreme court took jurisdiction of the cause, because the commitment had been made by a United States circuit court, and therefore fell within the appellate or revisory power of the former. It is by not attending carefully to the distinction between appellate and original jurisdiction, that the error is often made, of supposing this decision confines United States district and circuit courts and United States judges, to cases of technical commitments. That this decision, properly understood, goes as far as claimed in favor of issuing the writ where the restraint is under or by color of the United States authority, appears by the following extract from the opinion of the United States supreme court, in the Case of Watkins, 3 Pet. [28 U. S.] 201, pronounced by Justice Story: "No law of the United States prescribes the cases in which this great writ shall be issued, nor the power of the court over the party brought up by it. The term is issued in the constitution as one which was well understood, and the judicial act authorizes this court and all the courts of the United States, and the judges thereof, to issue the writ for the purpose of inquiring into the cause of commitment. This general reference to a power which we are required to exercise, without any precise definition of that power, imposes on us the necessity of making some inquiries into its use according to that law, which is, in a considerable degree, incorporated into our own. The writ of habeas corpus is a high prerogative writ known to the common law, the great object of which is the liberation of those who may

be imprisoned without sufficient cause. It is in the nature of a writ of error, to examine the legality of the commitment. The English judges, being originally under the influence of the crown, neglected to issue this writ where the government entertained suspicions which could not be sustained by evidence; and the writ when issued was sometimes disregarded or evaded, and great individual oppression was suffered in consequence of delays in bringing prisoners to trial. To remedy this evil, the celebrated habeas corpus act of Car. II. was enacted for the purpose of securing the benefits for which the writ was given. This statute may be referred to as describing the cases in which relief is, in England, afforded to a person detained in custody. It enforces the common law. This statute excepts from those who are entitled to its benefit persons committed for felony or treason, plainly expressed in the warrant, as well as persons convicted or in execution." Ex parte Watkins, 3 Pet. [28 U. S.] 201.

Yet the 33d section of that act provides as follows: "Upon all arrests in criminal cases, bail shall be admitted, except where the punishment may be death; in which cases it shall not be admitted but by the supreme or a circuit court, or by a justice of the supreme court, or a judge of a district court who shall," &c. By virtue of that provision the supreme court, in the Case of Hamilton, 3 Dall. [3 U. S.] 17, even admitted to bail the petitioner who had been, by a district judge, committed to jail for treason; the highest offence known to the law, and punishable with death. It would appear, therefore, that the privileges of this writ and the powers of the United States courts under it, are greater than were those of English courts and judges under the "habeas corpus act" (31 Car. II.)— as great, in fact, as the British judges and Lord Mansfield contended they were, during the parliamentary struggle already mentioned. It would seem clear that the framers of the act of 1789 had that struggle and its results in mind, and that such was the opinion of Judge Story and of the United States supreme court; for the habeas corpus act is pronounced by that court a mere enforcement of the common law, leaving the privileges of the writ not to depend upon that British statute, but upon rights far above and beyond its provisions. The views of that court seem to be, that in the exercise of original jurisdiction, within the purview of federal authority, the circuit and district courts, as well as judges of the United States, may issue the writ and hear the cause, in all cases where, by common law, it could have been issued in England. In every case that has been before the United States supreme court, where allusion has been made to the subject, that extent of power has been taken for granted, as if beyond all dispute— as if it were a point too well and incontrovertibly settled to be even called in question. Without quoting from all the authorities in

favor of that view, from Hamilton's Case, decided in 1795, down to the latest allusion in Howard's Reports, it may suffice to give the remarks of Justice Nelson in Ex parte Kaine, 14 How., [55 U. S.] 146, views from which, so far as this question is concerned, no one of the judges dissented. Justice Nelson thought the supreme court ought to take jurisdiction of the special case then under consideration, contending that a court subject to the revisory power of the former tribunal had given a decision which, in its appellate character, that tribunal could review. Nowhere was the power of United States courts of original jurisdiction doubted. "That case (Hamilton's Case), as understood and expounded in the Case of Bollman, in 1807, which received the most deliberate consideration of the court, and to which the doctrine of Hamilton's Case was applied, held that this great writ was within the cognizance of the court under the fourteenth section of the judiciary act, in all cases where the prisoner was restrained of his liberty, 'under or by color of the authority of the United States,' and no case has held the contrary since that decision, with the exception of that of Ex parte Metzger, decided in 1847, which I have already stated stands alone, but which distinctly admits the power and jurisdiction of the court in the case before us. (The Case of Metzger, turned solely on the question of appellate power.) This writ has always been justly regarded as the stable bulwark of civil liberty, and undoubtedly in the hands of a firm and independent judiciary, no person, be he citizen or alien, can be subjected to illegal restraint or be deprived of his liberty, except according to the law of the land. So essential to the security of the personal rights of the citizen was the uninterrupted operation and effect of this writ regarded by the founders of the republic, that even congress cannot suspend it, except when in cases of rebellion or invasion the public safety may require it. I cannot, therefore, consent to cripple or limit the authority conferred upon this court by the constitution and laws to issue it, by technical and narrow construction; but on the contrary, prefer to follow the free and enlarged interpretation always given when dealing with it by the courts of England, from which country it has been derived. They expound the exercise of the power benignly and liberally in favor of the deliverance of the subject from all unlawful imprisonment; and when restrained of his liberty, he may appeal to the highest common law court in the kingdom to inquire into the cause of it. So liberally do the courts of England deal with this writ, and so unrestricted is its operation in favor of the security of the personal rights of the subject, that the decision of one court or magistrate upon the return of it, requiring the discharge of the prisoner, is no bar to the issuing of a second, or third, or more, by any other court or magistrate having jurisdiction of the case.

and it may remand or discharge according to its judgment, upon the same matters. 13 Mees. & W. 679; 9 Adol. & E. 731; 1 East, 314; 14 East, 91; 2 Salk. 503; 5 Mees. & W. 47. Upon the whole, I am satisfied that the prisoner is in confinement under the treaty and act of congress without any lawful authority. I am of opinion, therefore, that the writ of habeas corpus should issue in the case, to bring up the prisoner."

No question was made as to the power and efficiency of the writ, or as to the jurisdiction of any court not restricted by the constitution to the exercise of appellate power. The only point of difference, it will be observed, was on the appellate question.

Some of the cases cited by counsel have been overruled, and some do not touch the subject under investigation. The case in Paine's Reports [Wilson v. Izard, Case No. 17,810] and the case in 3 Pet. 201, have already been noticed. In no case known and accessible to this court, has it ever been held that United States courts of original jurisdiction cannot issue the writ where a person is held in illegal restraint under or by color of the authority of the United States, whether there has been a technical "commitment" or not. The opinion of Judge Betts, cited by counsel in Barry v. Mercien, 5 How. [46 U. S.] 103, was undoubtedly correct. The legal proposition involved in his decision has long perplexed both federal and state courts. The various branches of that subject have, of late years, undergone elaborate discussion, viz.: Is there in either the federal government or in any state government a power, parens patriae, similar to that existing in England, either to make appointments to charitable uses in certain cases, or to control the custody of children, &c.—and if so in what department of government is the power lodged and to what extent? A very different subject from that now here. The decisions on this jurisdictional question already referred to, though sufficient of themselves, are by no means the most pointed. The case of U. S. v. Green [Case No. 15,256], is passed without especial comment, because the views of Judge Story, then expressed on the principal point considered, were overruled in 3 How. [44 U. S.] 103, although the decision of that eminent jurist on most of the subjects before him, at that time, are still unquestioned law. Ex parte Smith [Case No. 12,968], involved an inquiry into an executive warrant under color of the authority of the United States, and the jurisdiction was upheld by Judge Pope. The doctrines laid down in that case are not wholly inapplicable to the subject before this court; but as more direct decisions are to be found, it is unnecessary to pause for an analysis of that opinion. In Ex parte Jenkins [Id. 7,259]; Ex parte Robinson [Id. 11,935]; U. S. v. Morris [Id. 15,811], and Thomas v. Crossin [5 Clarke [Pa.] 328],—the United States judges or courts not only issued the writ of habeas corpus where there were commitments by state process, but where it did not appear on the face of the warrant that the process was under any color of authority of the United States. That course was held by the learned judges who issued the writs, to be not only permissible under the act of 1833, but to be an imperative duty. They even went behind the terms of those warrants or "commitments," and after proofs, aliunde, decided that as the commitments were illegal and for acts done under the authority of the United States, it was their duty to discharge the prisoners. True, the supreme court of Pennsylvania questioned the jurisdiction of the United States courts in such cases. But as that point is not involved here, it is not necessary to go into any inquiry concerning the scope of the acts of 1833 and 1789 under such circumstances. Suffice it to say, that in each instance where the federal courts have been compelled to act under the law of 1833, so far as is known, they have not failed to exercise and enforce their authority in cases similar to those just mentioned. Judge McLean and Judge Grier, of the supreme court, have given elaborate, convincing and sound decisions upon that subject: the correctness of which Judges Leavitt, Kane, and Miller, of the district courts, have not hesitated to put into practical application, despite local excitement, prejudices and resistance. In the case of U. S. v. Williamson [Case No. 16,725], Judge Kane, of the United States district court for the Eastern district of Pennsylvania, issued this writ where the cause of detainer was not alleged to be under or by color of any process whatsoever, or of the authority of the United States. The petitioner's slaves were seized by respondent, or by a mob at his instigation, as was charged, whilst they were passing through Philadelphia; and were so seized without any process, commitment or color of authority. The respondent of his own motion and by his mere arbitrary act, interfered with and detained from their master, his slaves whilst in transit, and as was contended, in violation of petitioner's rights under the constitution and laws of the United States. That pure and able judge did not hesitate about what his official duty demanded. The writ was issued. The respondent made an evasive if not false return, and was imprisoned for contempt. Subsequently he applied to Chief Justice Lewis, of Pennsylvania, for a writ to procure his discharge; one ground of the application being Judge Kane's want of jurisdiction. Chief Justice Lewis refused the writ. At the following term of the supreme court of that state, a similar application was made, fully argued and considered, but that court also refused to grant him any relief. Although the main point before the supreme court of Pennsylvania was as to the conclusiveness of the judgment for contempt, yet it is evident from the opin-

ions given, and the dissenting views of Judge Knox, that the jurisdictional question was also duly weighed and settled. A brief extract from the opinion of the supreme court of that state by Black, J., will give its general views: "It is argued that the court (United States district court) had no jurisdiction because it was not averred that the slaves were fugitives, but merely that they owed service by the laws of Virginia. Conceding for the argument's sake that this was the only ground on which the court could have interfered—conceding, also, that it is not substantially alleged in the petition of Mr. Wheeler—the proceeding was, nevertheless, not void for that reason. The federal tribunals, though courts of limited jurisdiction, are not inferior courts. Their judgments, until reversed by the proper appellate court, are valid and conclusive upon the parties, though the jurisdiction be not alleged in the pleadings nor on any part of the record. [M'Cormick v. Sullivant] 10 Wheat. [23 U. S.] 192. Even if this were not settled and clear law, it would still be certain that the fact on which jurisdiction depends need not be stated in the process. The want of such a statement in the body of the habeas corpus, or in the petition on which it was awarded, did not give Mr. Williamson a right to treat it with contempt. If it did, then the courts of the United States must set out the ground of their jurisdiction, in every subpoena for a witness, and a defective or untrue averment will authorize a witness to be as contumacious as he sees fit." Again: "I say the writ was legal, because the act of congress gives to the courts of the United States the power to 'issue writs of habeas corpus when necessary for the exercise of their jurisdiction, and agreeable to the principles and usages of law.' A part of the jurisdiction of the district court consists in restoring fugitive slaves; and the habeas corpus may .be used in aid of it when necessary." 26 Pa. St. 21.

Without stopping to inquire into the correctness of the reasoning used, or indorsing it in all its length and breadth, the opinion indicates how far jurists think the United States courts can go in upholding federal jurisdiction over this great writ. In the act of 1850 [9 Stat. 462] there is no express provision on the subject, and it is well known that one of the principal objections taken to that statute was in consequence of that omission. If either party could come before a court on that writ, then the questions sought to be reached by the objectors might be brought before the courts in some cases, at the place of capture. Hence that statute furnishes no explanation of the course of Judge Kane, nor was his action based upon its provisions. As will be seen hereafter, he placed his jurisdiction on other grounds. The separate opinion of Judge Lowrie, and the points of dissent by Judge Knox (the latter to be found in Williamson's Case [26 Pa.

St. 9]), show that the question of Judge Kane's jurisdiction in issuing the writ was fully before the supreme court of Pennsylvania. Judge Knox took this ground: "That where a person is imprisoned by an order of the judge of the district court of the United States for refusing to answer a writ of habeas corpus, he is entitled to be discharged from such imprisonment if the judge of the district court had no authority to issue the writ." Still he was not discharged. It is true, the court put the case mainly on another question—one sufficient to prevent his discharge—yet the jurisdictional proposition was discussed, and by the chief justice upheld in favor of the United States district court, in that very case. In his opinion, the chief justice expressed the following views: "The habeas corpus is a common law writ, and has been used in England from time immemorial, just as it is now. The statute of 31 Car. II. c. 2, made no alteration in the practice of the courts in granting these writs. 3 Barn. & Ald. 420; 2 Chit. 207. It merely provided that the judges in vacation should have the power which the courts had previously exercised in term time (1 Chit. Gen. Prac. 686) and inflicted penalties upon those who should defeat its operation. The common law upon this subject was brought to America by the colonists, and most, if not all, of the states have since enacted laws. resembling the English statute of Charles II. in every principal feature. The constitution of the United States declares that "the privilege of a writ of habeas corpus shall not be suspended unless when in cases of rebellion or invasion, the public safety may require it." Congress has conferred upon the federal judges the power to issue such writs according to the principles and rules regulating them in other courts. Seeing that the same general principles of common law on this subject prevail in England and America, and seeing also the similarity of the statutory regulation in both countries, the decisions of the English judges, as well as of the American courts, both state and federal, are entitled to our fullest respect, as settling and defining our powers and duties. * * * * * * The district court of the United States is as independent of us, as we are of it—as independent as the supreme court of the United States is of either. What the law and constitution have forbidden us to do directly on writ of error, we, of course, cannot do indirectly by habeas corpus. But the petitioner's counsel have put his case on the ground that the whole proceeding against him in the district court was coram non judice, null and void. It is certainly true that a void judgment may be regarded as no judgment at all, and every judgment is void which clearly appears on its own face to have been pronounced by a court having no jurisdiction or authority on the subject matter. For instance, if a federal court should convict and sentence a citi-

zen for libel, or if a state court, having no jurisdiction except in civil pleas, should try an indictment for a crime, and convict the party, in these cases the judgments would be wholly void. If the petitioner can bring himself within this principle, then there is no judgment against him; he is wrongfully imprisoned, and we must order him to be brought out and discharged."

This case is by no means relied upon as conclusive, or as settling the question now under consideration. It is referred to mainly for the purpose of indicating the thoroughness with which the subject has been debated, and as introductory to the masterly reasoning of Judge Kane himself, when the whole doctrine again came before him for judicial review. That reasoning and his construction of the act of 1789 seem wholly incorrect, to the extent already stated in this opinion. As to the correctness of its application in the Wheeler Case, it is not necessary to determine here. It is sufficient if there is jurisdiction where the petitioner is under restraint "by color of the authority of the United States," as is averred in McDonald's petition. The views expressed by the United States district court for the Eastern district of Pennsylvania, per Kane, J. (U. S. v. Williamson [supra]), are full and conclusive, so far as our present inquiry is concerned; and it is well to give them somewhat at length:

"The writ of habeas corpus is of immemorial antiquity; it is deduced by the standard writers on the English law from the great charter of King John. It is unquestionable, however, that it is substantially of much earlier date; and it may be referred, without improbability, to the period of the Roman invasion. Like the trial by jury, it entered into the institutions of Rome before the Christian era, if not as early as the times of the republic. Through the long series of political struggles which gave form to the British constitution, it was claimed as the birthright of every Englishman, and our ancestors brought it with them as such to this country. At the common law it issued whenever a citizen was denied the exercise of his personal liberty, or was deprived of his rightful control over any member of his household, his wife, his child, his servant. It issued from the courts of the sovereign, and, in his name, at the instance of any one who invoked it, either for himself or another. It commanded, almost in the words of the Roman edict, 'de libero homine exhibendo,' that the party under detention should be produced before the court, there to await its decree. It left no discretion with the party to whom it was addressed. He was not to constitute himself the judge of his own rights or of his own conduct, but to bring in the body, and to declare the cause wherefore he had detained it; and the judge was then to determine whether that cause was sufficient in law or

not. Such in America, as well as England, was the well-known, universally recognized writ of habeas corpus. When the federal convention was engaged in framing a constitution for the United States, a proposition was submitted to it by one of the members that 'the privileges and benefits of the writ of habeas corpus shall be enjoyed in this government in the most expeditious and ample manner; and shall not be suspended by the legislature except upon the most urgent and pressing occasions.' The committee to whom it was referred for consideration, would seem to have regarded the privilege in question as too definitely implied in the idea of free government to need formal assertion or confirmation; for they struck out that part of the proposed article, in which it was affirmed, and retained only so much as excluded the question of its suspension from the ordinary range of congressional legislation. The convention itself must have concurred in their views, for in the constitution, as digested and finally ratified, and as it stands now, there is neither enactment nor recognition of the privilege of this writ, except as it is implied in the provision that it shall not be suspended. It stands then under the constitution of the United States as it was under the common law of English America, an indefeasible privilege, above the sphere of ordinary legislation. I do not think it necessary to argue from the words of this article that the congress was denied the power of limiting or restricting or qualifying the right, which it was thus forbidden to suspend. I do not, indeed, see that there can be a restriction or limitation of a privilege which may not be essentially a suspension of it, to some extent at least, or under some circumstances, or in reference to some of the parties who might otherwise have enjoyed it. And it has appeared to me, that if congress had undertaken to deny altogether the exercise of this writ by the federal court, or to limit its exercise to the few and rare cases that might peradventure find their way to some one particular court, or to declare that the writ should only issue to this or that class of cases, to the exclusion of others in which it might have issued at the common law, it would be difficult to escape the conclusion that the ancient and venerated privilege of the writ of habeas corpus had not been in some degree suspended, if not annulled. But there has been no legislation or attempted legislation by congress that would call for an expansion of this train of reasoning.

"There was one other writ, which in the more recent contests between the people and the king, had contributed signally to the maintenance of popular right. It was the writ of scire facias which had been employed to vindicate the rights of property, by vacating the monopolies of the crown. Like the writ of habeas corpus, it founded

itself on the concessions of Magna Charta; and the two were the proper and natural complements of each other. The first congress so regarded them. The protection of the citizen against arbitrary exaction and unlawful restraint, as it is the essential object of all rightful government, would present itself, as the first great duty of the courts of justice that were about to be constituted. And if, in defining their jurisdiction, it was thought proper to signalize two writs out of the many known to the English law, as within the unqualified competency of the new tribunals, it would seem natural that those two should be selected which boasted their origin from the charter of English liberties, and had been consecrated for ages in the affectionate memories of the people as their safeguard against oppression. This consideration has interpreted for me the terms of the statute, which define my jurisdiction on this subject. Very soon after I had been advanced to the bench I was called upon to issue the writ of habeas corpus, at the instance of a negro, who had been arrested as a fugitive from labor. It was upon the force of the argument, to which I now advert, that I then awarded the process; and from that day to this, often as it has been invoked and awarded in similar cases that have been before me, my authority to award it has never been questioned. The language of the act of congress reflects the history of the constitutional provision. * * * I am aware that it has sometimes been contended or assumed without, as it seems to me, a just regard to the grammatical construction of these words, that in the construction of these words the concluding limitation applies to all the process of the court, the two writs specially named among the rest; and that the federal courts can only issue the writ of habeas corpus, when it has become necessary to the exercise of an otherwise delegated jurisdiction; in other words, that it is subsidiary to some original or pending suit. It is obvious, that if such had been the intention of the law-makers, it was unnecessary to name the writ of habeas corpus at all; for the simpler phrase, 'all writs necessary, &c.,' would in that case have covered their meaning. But there are objections to this reading more important than any that found themselves on grammatical rules. The words that immediately follow in the section, give the power of issuing the writ to every judge for the purpose of inquiring into the causes of a commitment. Now, a commitment pre-supposes judicial action, and this action it is the object of the writ to review. Can it be, that a single judge, sitting as such, can re-examine the causes of a detainer, which has resulted from judicial action, and is therefore prima facie a lawful one; and yet that the court, of which he is a member, cannot inquire into the cause of a detainer, made without judicial sanction,

and therefore prima facie unlawful? Besides, if this were the meaning of the act, it might be difficult to find the case to which it should apply. I speak of the writ of habeas corpus ad subjiciendum, the great writ of personal liberty referred to in the constitution; not that modification of it which applies specially to the case of a commitment, nor the less important forms of habeas corpus ad respondendum, ad faciendum, &c., which are foreign to the question. I do not remember to have met a case, either in practice or in the books, where the writ ad subjiciendum could have performed any pertinent office in a pending suit. There may be such, but they do not occur to me; and I incline very strongly to the opinion, that if the power to issue the writ of habeas corpus applies only to cases of statutory jurisdiction, outrages upon the rights of a citizen can never invoke its exercise by a federal court. If such were indeed the law of the United States, I do not see how I could escape the conclusion, that the jealousy of local interests and prejudice, which led to the constitution of federal courts, regarded only disputes about property; and that the liberty of a citizen, when beyond the state of his domicil, was not deemed worthy of equal protection. From an absurdity so gross as this, I relieve myself by repeating the words of Chief Justice Marshall in Ex parte Watkins, 3 Pet. [28 U. S.] 201: 'No law of the United States prescribes the cases in which this great writ shall be issued, nor the power of the court over the party brought up on it.' Whether, then, I look to the constitution and its history, or to the words or the policy of the act of congress, I believe that it was meant to require of the courts of the United States, that they should dispense the privileges of the writ of habeas corpus to all parties lawfully asserting them, as other courts of similar functions and dignity had immemorially dispensed them at the common law. The congress of 1789 made no definition of the writ, or of its conditions or effects. They left it as the constitution left it, and as it required them to leave it, the birthright of every man within the borders of the States; like the right to air, and water, and motion, and thought; rights imprescriptible and above all legislative discretion or caprice. And so it ought to be. There is no writ so important for good, and so little liable to be abused. At the worst, in the hands of a corrupt and ignorant judge it may release some one from restraint who should justly have remained bound. But it deprives no one of freedom, and divests no right."

The following year (1856) the same subject was considered in the United States circuit court for California, and the opinion given by Judge McAllister. The petition for the writ set out, that the petitioner (Des Rochers) was an alien, that the supreme court of the state consisted of three judges;

that two were essential for the transaction of business; that the petitioner had an important suit pending which his interest demanded should be speedily heard, but that it could not be heard because one of those judges (Heydenfelt) was absent from the state, and because another, the "Hon. David S. Terry is unlawfully restrained of his liberty against his consent, * * * and held by them in unlawful custody, and is not confined in any jail, nor by color of authority of any state, or of any magistrate thereof," &c.; and closed with the usual prayer for the writ, &c. Here it was not even averred that the prisoner was held "under or by color of authority of the United States," nor that there was any technical commitment. It negatived the idea, however, that he was restrained by any state authority. The writ was granted, on the following grounds: "It is an immediate remedy for every illegal imprisonment." 1 Watts, 67. In a word, whenever a person has been deprived of going when, and where he pleases, and restrained of his liberty, he has a right to inquire if that restraint be legal, whether it be by a jailor, constable, or private individual. 2 Ashm. 247, cited in 4 Bac. Abr. 571. * * * This great writ existed for all remedial purposes, not only anterior to the enactment of the habeas corpus act in England, but prior to the time of Magna Charta. In the reign of second Charles, the habeas corpus act was passed, to repel the aggressions of the crown and its minions. Those aggressions clothed themselves in the form of legal proceedings in the name of the crown, and hence the terms of the act were limited to persons confined on criminal process. But the habeas corpus, brought by our ancestors as their birthright, to this country, was the common-law habeas corpus; that great embodiment of a free principle, which, born with the sturdy Roman, preserved by the free Saxon, was so cherished by our immediate sires that they engrafted into our organic law the declaration, "that the privilege of the writ of habeas corpus shall not be suspended, &c. * * * The proposition, then, is established, both by federal and state authority, that in determining upon the nature and character of the habeas corpus mentioned in the constitution and judiciary act of the United States, regard is to be had, not to the limits prescribed by the British statutes, but to the more liberal principles in this particular of the common law by which it is regulated. By those principles it was issued in England to relieve any person from illegal restraint. Its operation in this country should not be less beneficent. It remains to consider to what extent the act of congress, giving to the federal judiciary the power to issue this great writ, has limited and controlled the cases to which at common law it confessedly applies. In doing so, we must bear in mind that we are

fixing a construction which is to decide whether the federal courts are to extend to or withhold from persons a great constitutional right, in many cases to which the common law applies. No law, say the supreme court of the United States, prescribes the cases in which this great writ shall be issued, nor the power of the court over the party when brought up by it. The term used in the constitution is one well understood, and the judiciary act authorizes all the courts of the United States and the judges thereof, to issue the writ for the purpose of inquiring into the cause of commitment. While it is evident that the proviso to the fourteenth section limits equally the powers of the courts and judges (admitted to do so by the court in the Williamson Case), it by no means follows that equalizing and restricting their powers as to persons in jail, has denuded them of all power, where they have jurisdiction of the parties, to relieve from illegal restraint, save in cases where the suffering parties are in jail under the authority of the United States. The proviso simply inhibits them from sending the writ to any persons in legal custody in jail, unless there under the authority of the United States. The alien or citizen of another state who is restrained of his liberty by lawless men, who is under no legal restraint, has a right to appeal to the laws of the country for relief. If in jail, or legal custody, not under color of authority of the United States, he is remitted to those laws which placed him there. This is, in my opinion, the true construction of the proviso, in which I am confirmed by the action of Judge Story, and by the opinions of the district judge of the district court of the United States for the Eastern district of Pennsylvania, and the supreme court of that state. It was in exercise of this jurisdiction that Judge Kane issued the writ in the Williamson Case. * * * These views are as sound law as they are eloquently expressed. In the case at bar, the applicant is an alien resident in this place, is not only interested in the matter to the extent that man concedes to sympathy with the oppressed, but is pecuniarily interested to a large amount. He is not in jail, nor in any custody known to the law, but held in restraint against his will, and in direct violation of those laws. Case of Des Rochers [Case No. 3,824]."

This bases the petitioner's right apparently on the ground that he is an alien, interested in the liberty of the prisoner, and that the latter is held under unlawful restraint without any state authority. Nothing at all is said of a commitment. It is well known that he was held by the mere arbitrary will of a mob organized under the name of a vigilance committee, and without any process, warrant, or any other legal authority. It was not considered necessary to the jurisdiction of that court, that there should have been a

technical commitment, nor was it so held in the Williamson Case, nor has it been in any other case where a United States judge acts, or a United States court of original jurisdiction, so far as is known to this court. ·

Enough has been said, it is hoped, to demonstrate that the question of jurisdiction does not depend, in the slightest degree, upon the fact whether there has been a formal commitment or not, or whether the prisoner is in jail; but the sole inquiry is—whether he is held in unlawful restraint of his liberty "under or by color of the authority of the United States." The petition in this case so avers in express terms, and also negatives by apt words that he is held by any state authority or under any legal process whatever. The case, therefore, comes fully within what is deemed the true rule, and all correct adjudications. Whether the rule was correctly applied by Judge Kane or Judge McAllister, it is not important to discuss; but it is certain, they held .it to extend much farther than there is any occasion for, to give this court unquestioned jurisdiction in the case now before it.

Fourth. To remove all shadow of doubt, only one step further need be taken—that is, to determine whether the state courts, (as contended by counsel,) have either exclusive or concurrent jurisdiction. The United States supreme court has settled that point also. It solemnly decided in 1S58, that the state courts have no jurisdiction whatsoever where the confinement is under the authority of the United States. . The opinion is too clear and important to be omitted. It was pronounced by Chief Justice Taney. The importance of the questions discussed by him, and the force of his reasoning furnish ample justification, for the length of the extract made: "There can be no such thing as judicial authority, unless it is conferred by a government or sovereignty; and if the judges and courts of Wisconsin possess the jurisdiction they claim, they must derive it either from the United States or the state. It certainly has not been conferred on them by the United States, and it is equally clear it was not in the power of the state to confer it, even if it had attempted to do so; for no state can authorize one of its judges or courts to exercise judicial power, by habeas corpus or otherwise, within the jurisdiction of another and independent government. And, although the state of Wisconsin is sovereign within its territorial limits to a certain extent, yet that sovereignty is limited and restricted by the constitution of the United States. And the powers of the general government of the state, although both exist and are exercised within the same territorial limits, are yet separate and distinct sovereignties. acting separately and independently of each other, within their respective spheres. And the sphere of action appropriated to the United States, is as far beyond the reach of the judicial process is-

sued by a state judge or a state court, as if the line of division was traced by landmarks and monuments visible to the eye. * * * The constitution was not formed merely to guard the states against danger from foreign nations, but mainly to secure union and harmony at home, for, if this object could be attained, there would be but little danger from abroad; and, to accomplish this purpose, it was felt by the statesmen who framed the constitution, and by the people who adopted it, that it was necessary that many of the rights of sovereignty which the state then possessed, should be ceded to the general government; and that, in the sphere of action assigned to it, it should be supreme and strong enough to execute its own laws by its own tribunals, without interruption from a state or state authorities. And it was evident that everything short of this would be inadequate to the main objects for which the government was established; and that local interests, local passions or prejudices, incited and fostered by individuals for sinister purposes, would lead to acts of aggression and injustice by one state upon the rights of another, which would ultimately terminate in violence and force, unless there was a common arbiter between them, armed with power enough to protect and guard the rights of all, by appropriate laws, to be carried into execution peacefully by its judicial tribunals. * * * We do not question the authority of a state court or judge, who is authorized by the laws of the state to issue the writ of habeas corpus, to issue it in any case where the party is imprisoned within its territorial limits, provided it does not appear, when the application is made, that the person imprisoned is in custody under the authority of the United States. The court or judge has a right to inquire, in this mode of proceeding, for what cause and by what authority the prisoner is confined within the territorial limits of the state sovereignty, and it is the duty of the marshal, or other person having the custody of the prisoner, to make known to the judge or court, by a proper return, the authority by which he holds him in custody. This right to inquire by process of habeas corpus, and the duty of the officer to make a return. grows necessarily out of the complex character of our government, and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each within its sphere of action prescribed by the constitution of the United States, independent of the other. But after the return is made, and the state judge or court judicially apprized that the party is in custody under the authority of the United States, they can proceed no further. They then know that the person is within the dominion and jurisdiction of another government, and that neither the writ of habeas corpus nor any other process issued under the state authority can pass over the line of division between the two

sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offence against their laws, their tribunals alone can punish him; if he is wrongfully imprisoned, their tribunals can release him and afford him redress. And although, as we have said, it is the duty of the marshal, or other person holding him, to make known, by a proper return, the authority under which he detains him, it is at the same time imperatively his duty to obey the process of the United States to hold the prisoner in custody under it, and to refuse obedience to the mandate or process of any other government, and consequently it is his duty not to take the prisoner, nor suffer him to be taken, before a state judge or court upon a habeas corpus issued under state authority. No state judge or court, after they are judicially informed that the party is imprisoned under the authority of the United States, has any right to interfere with him, or to require him to be brought before them. And if the authority of a state, in the form of judicial process or otherwise, should attempt to control the marshal, or other authorized officer or agent of the United States, in any respect, in the custody of his prisoner, it would be his duty to resist it, and to call to his aid any force that might be necessary to maintain the authority of law against illegal interference. No judicial process, whatever form it may assume, can have any lawful authority outside of the limits of the jurisdiction of the court and judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence. Nor is there anything in this supremacy of the general government, or the jurisdiction of its judicial tribunals, to awaken the jealousy or offend the natural and just pride of state sovereignty. Neither this government nor the powers of which we are speaking were forced upon the states. The constitution of the United States, with all the powers conferred by it on the general government, and surrendered by the states, was the voluntary act of the people of the several states, deliberately done, for their own protection and safety against injustice from one another, and their anxiety to preserve it in full force in all its powers, and to guard against resistance to, or evasion of, its authority, on the part of a state, is provided by the clause which requires that the members of the state legislatures, and all executive and judicial officers of the several states, as well as those of the general government, shall be bound, by oath or affirmation, to support this constitution. This is the last and closing clause of the constitution, and inserted when the whole frame of government, with the powers herein-before specified, had been adopted by the convention, and it was in that form, and with these powers, that the constitution was submitted

to the people of the several states for their consideration and decision. Now, it certainly can be no humiliation to the citizen of a republic to yield a ready obedience to the laws as administered by the constituted authorities. On the contrary, it is among his first and highest duties as a citizen, because free government cannot exist without it; nor can it be inconsistent with the dignity of a sovereign state to observe faithfully, and in the spirit of sincerity and truth, the compact into which it voluntarily entered when it became a state of this Union. On the contrary, the highest honor of sovereignty is untarnished faith; and certainly no faith could be more deliberately and solemnly pledged than that which every state has plighted to the other states, to support the constitution as it is, in all its provisions, until they shall be altered in the manner which the constitution itself prescribes. In the emphatic language of the pledge required, it is to support this constitution. Ableman v. Booth, 21 How. [62 U. S.] 515."

As then the states have no authority in the cases named, it follows inevitably that, if the United States courts cannot proceed, the liberties of the people are hopelessly at the mercy of all lawlessness and violence, whether exerted by the arbitrary will of one man or many, whenever the oppressor acts under color of the authority of the United States—a condition worse than ever known in England since the days of Magna Charta, and wholly incompatible with the idea of civil or constitutional liberty. So far, however, is it from being true, that such is the deplorable condition of any American citizen, the reverse is the fact. Every one who is illegally restrained of his liberty, under color of United States authority, has the fullest redress in the United States courts. Not only has he a constitutional right to apply for deliverance from illegal restraint, but it is the duty of the court to exhaust all its power to enforce his application.

In whatever light the question is viewed, the conclusion seems, to this court, to be irresistible; and therefore, without a shadow of doubt, it pronounces its jurisdiction in this case to be clear, positive, and ample.